Commonwealth *v.* Kennedy, Appellant.

Argued September 27, 1937.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*E. G. Scoblionko* and *Charles H. Young,* for appellant.

*Edward S. McCluskey*, City Solicitor, for appellee.

OPINION BY KELLER, P. J., December 17, 1937:

On December 1, 1936, the City of Easton, a city of the third class, adopted an ordinance entitled "An ordinance prohibiting and regulating the kinds and classes of traffic in and upon certain streets and highways in the City of Easton, Pennsylvania, and fixing and providing penalties for the violation thereof." It provided, inter alia, that it should be unlawful for any person to drive or operate any commercial vehicle, as defined and classified in section 2 of the ordinance,[1] over and upon portions of nine named streets and highways in the City of Easton, Pennsylvania, including the following: (a) Knox Avenue, between the City Line and Cattell Street; ...... (c) Cattell Street, between Raub Street and College Avenue; ...... (e) College Avenue, between Cattell Street and Third Street. All of the streets and highways designated in the ordinance were located in the residential district known as College Hill, because of its proximity to Lafayette College, and constituting the Third Ward. The grades of the streets in this locality are steep, ranging from 8.29 per cent.— that is, a rise of 8.29 feet in 100 feet—to 8.39 per cent. on Knox Avenue; from 5.76 to 12.85 per cent. on Cattell Street; and from 5.74 to 10.62 per cent. on College Avenue. On some other streets named in the ordinance the grade is as steep as 14 per cent. The ordinance was adopted following the receipt of a petition signed by

---

[1] "Section 2. The kinds and classes of commercial motor vehicles subject to the regulations and prohibitions of this ordinance are hereby designated and defined as follows: (a) All buses and commercial motor vehicles transporting passengers for pay or hire, except where the principal routes thereof lie within the limits of the City of Easton; (b) all trucks, trailers, semi-trailers and other commercial motor vehicles not having a destination within the limits of the Third Ward of the City of Easton, for the purpose of loading or unloading."

1,750 citizens of the Third Ward, praying for relief from truck, trailer, bus and other commercial traffic upon certain streets in that ward in the interest of the safety of themselves and their children, and for the protection of their health, and the preservation from depreciation of their properties. Section 3 of the ordinance provided that anyone convicted before the Mayor or any alderman of the city of a violation of any of its provisions should be sentenced to pay a fine of not more than ten dollars for each and every violation, and in default of payment, should be committed to the city or county prison for a period not exceeding ten days.

Printed signs were erected at points of entrance to the restricted streets, reading as follows:

TRAFFIC REGULATIONS

Trucks — Buses — Trailers

Engaged in Through Traffic

Prohibited on this Street

AT ALL TIMES

Bureau of Police

On February 12, 1937, the appellant, Robert B. Kennedy, was arrested by a police officer of the city, while driving a Greyhound bus—admittedly a bus transporting passengers for pay or hire between Philadelphia and Scranton, via Easton and Wilkes-Barre, and a commercial motor vehicle as defined and classified in the ordinance—on Cattell Street between Raub Street and College Avenue, contrary to the provisions of section 1 (c) of said ordinance, and was taken before an alderman of the city, charged with violating its provisions. Following a hearing he was convicted and sentenced to pay a fine of five dollars. Pursuant to a petition to the Court of Quarter Sessions, an appeal was specially allowed and a hearing had de novo before Judge Mc-Keen, who, after full consideration, adjudged him guilty and sentenced him to pay a fine of five dollars

and costs of prosecution. From that judgment he has appealed to this Court.

The appellant rests his appeal upon three propositions:

(1) That the ordinance is an unreasonable exercise of the police power because it unlawfully discriminates, as respects the use of the streets named in it, (a) between motor vehicles transporting passengers for hire through the city and those whose principal routes lie within the city limits; and (b) between motor trucks, etc. carrying goods through the city and those loading and unloading within the third ward, the district covered by the ordinance.

(2) That the city is without power to deny to the holder of a certificate of public convenience, issued by the Public Service Commission, now the Pennsylvania Public Utility Commission, the use of any streets included within the route designated in the certificate.

(3) That the ordinance is void because it imposes an undue burden on interstate commerce.

We will consider them in that order.

(1) Strictly speaking the appellant is not concerned with the second subdivision of this heading. He was not driving a motor truck, trailer, semi-trailer or commercial motor vehicle engaged in the transportation of goods. He is only concerned with the first subdivision, relating to busses and commercial motor vehicles transporting passengers for pay. It is well settled that one cannot question the constitutionality of a statute—and this includes municipal ordinances—unless injuriously affected by the particular matter alleged to be unconstitutional: *Eisenhart v. Penna. Milk Control Board,* 125 Pa. Superior Ct. 483, 485, 190 A. 405, and cases cited therein; *Hendrick v. State of Maryland,* 235 U. S. 610. We shall, however, discuss the matter generally and as relating to both subdivisions, even though, because of the difference in the language used in respect

to the two subjects treated, a holding that the ordinance was invalid as to busses transporting passengers would not necessarily apply to trucks hauling goods.

At present, the distinction between through busses and busses whose principal routes lie within the city limits is of no practical importance, for there are no busses or other commercial vehicles transporting passengers for pay which have their principal routes within the City of Easton. The clause was inserted only as a precautionary measure to provide for a possible future discontinuance of street car service in the regulated district and the substitution of motor busses in its place. But even so, we are of opinion that the classification is not so arbitrary and unreasonable as to be unduly discriminatory and invalidate the ordinance. And the like conclusion applies to the distinction between through trucks and those that come into the regulated district only to receive a shipment of goods for carriage or to deliver a shipment at destination.

The evidence, so far from showing the arbitrary and unreasonable character of the ordinance, establishes just the contrary. The physical conformation of the ground—College Hill—creates conditions which justify regulation, and even prohibition, of certain motor vehicle traffic, in the interest of the public safety, health and welfare. Its steep grades, dangerous to all traffic at certain seasons of the year, in conjunction with its residential character, warrant a reasonable discrimination in the use of its streets against certain forms of traffic most likely to result in injury to life and property, and where other reasonably convenient routes in the city are available to the traffic thus excluded in the interest of the public safety and welfare, the latter has no just cause for complaint.

The ordinance makes no distinction between residents of this State and non-residents. Appellant, himself, resides within the State, in Philadelphia. It makes

no discrimination between residents and taxpayers of Easton and non-residents or non-taxpayers. Appellant would be equally subject to its provisions if he lived and paid taxes in Easton. Hence, the long list of cases cited by appellant dealing with municipal ordinances discriminating in favor of local residents or taxpayers and against non-residents of the municipality or state, as respects the right to solicit business, take orders, etc., or requiring licenses to do business, but exempting persons residing or paying taxes in the municipality from complying with its provisions, and similar decisions, state and federal, along the same line, have no application here. Nor does the ordinance make any distinction between intrastate through traffic and interstate through traffic; both are accorded the same treatment.

The right of cities to regulate and control the use of their streets rests upon legislative grant, express or implied: *Appeal of City of Pittsburgh*, 115 Pa. 4, 24, 7 A. 778; *Collins v. Public Service Commission*, 84 Pa. Superior Ct. 58, 62; *Edgewood Borough v. Scott*, 29 Pa. Superior Ct. 156, 159. But, in our opinion, the legislative grant in effect was sufficiently broad and inclusive to sustain the ordinance. In *Setzer v. City of Pottsville*, 73 Pa. Superior Ct. 573, an ordinance designating certain streets on which *interurban busses* should be operated, and *forbidding such operation upon other streets of the city* was held not to be an unreasonable exercise of the power conferred by the Act of June 1, 1915, P. L. 685, authorizing cities to regulate and license certain motor vehicles, which provided that each city might regulate the transportation by motor vehicles (not operated on tracks) of passengers or property, for pay, within the limits of the city, or from points in the city to points beyond the limits of the city; and in such regulation might make regulations for the operation of vehicles, and might designate certain streets upon which such vehicles, if operated, must

be operated. An ordinance forbidding the operation of motor busses and motor trucks, transporting passengers or property for pay, on certain streets, comes within the provisions of the act and is a valid exercise of the powers conferred; for it is, in effect, an implied designation of the streets not forbidden as those which may lawfully be used for such operation. The Act of June 1, 1915, supra, was repealed as to third class cities by section 4701 of the Third Class City Law of June 23, 1931, P. L. 932, p. 1150; but its provisions were almost identically re-enacted in section 2602, of the Third Class City Law of 1931, p. 1030, 53 PS section 12198-2602, as follows: "Each city may regulate the transportation by motor vehicles (not operated on tracks) of passengers or property, for pay, within the limits of the city, or from points in the city to points beyond the limits of the city. In such regulation, the city may impose reasonable license fees, make regulations for the operation of vehicles, and may designate certain streets upon which such vehicles may only be operated."

This section has not been modified or repealed by any amendment to the Third Class City Law, and being practically identical with the Act of 1915, which was applied in *Setzer v. City of Pottsville*, supra, that decision is still authoritative and upholds the legislative grant of power to the city to forbid by ordinance the use of certain streets by motor busses and motor trucks in the transportation of persons or property for pay. The Vehicle Code of May 1, 1929, P. L. 905, Art. XI, sec. 1103, (p. 988), as amended by the Acts of June 22, 1931, P. L. 751, section 2, and July 16, 1935, P. L. 1056, sec. 36, (p. 1087) 75 PS sec. 663, authorizing local authorities, inter alia, to "regulate the transportation by motor vehicles of passengers for compensation within the limits of a city, or from points in the city to points beyond the city limits, and make and enforce regulations for the operation of such vehicles

not inconsistent with this act, and designate certain streets upon which such vehicles may be operated," is not in conflict with or in limitation of the powers granted in the Third Class City Law, supra.

The power thus expressly given the City is not invalidated by reasonable provisions intended to secure to residents within the district the opportunity of traveling by motor bus from their homes to their places of business and back again, or of having goods delivered to their homes by motor trucks, or taken from there for shipment elsewhere. The exception from the operation of the ordinance of such reasonable necessities of modern urban life cannot serve as an excuse for invalidating the general right of regulation thus conferred on the city, where reasonable ground exists for the regulation and classification and the ordinance is not discriminatory in object and effect. On this point, the finding of the trial judge is pertinent: "The ordinance makes a classification of all truck traffic, to wit, trucks hauling freight, etc., and busses engaged in carrying passengers, through the City of Easton. All persons, corporations and firms engaged in the same business, to wit, through traffic by trucks hauling passengers, freight or otherwise, are under the same restrictions. The testimony taken in support of the appeal discloses that in order to reach the street upon which traffic is prohibited by the ordinance in question, it is necessary to travel over steep grades. The ordinance does not prohibit the entrance or exit in the City over other routes which are open and unrestricted from such classified traffic. There are at least three other routes available to the restricted class for entrance and exit to the City which reach the highway, the entrance of which is barred by the ordinance," and "The routes left open and unrestricted from classified traffic in the City of Easton, approaching route No. 102, do not contain the same element of danger, particularly in winter,

as the route affected by the ordinance in question." In view of these facts the classification or regulation imposed by the ordinance is reasonable, not unduly discriminatory nor burdensome: *Bothwell v. York City,* 291 Pa. 363, 370, 371, 140 A. 130; *Soon Hing v. Crowley,* 113 U. S. 703. If a municipality, under zoning ordinances authorized by the General Assembly, can lawfully and constitutionally regulate and prohibit the use of one's own real property for commercial purposes within a residential district, in the interest of the public safety, health and welfare, it would seem that it would have the power, in the same interest, to regulate and prohibit through commercial traffic by motor trucks and motor busses on certain streets, where reasonable grounds for such regulation and prohibition exist and other avenues of entrance and exit are open to such through traffic, and no unreasonable or undue burden or discrimination is thereby imposed.

(2) Nor is the ordinance invalid because it includes within its restrictive provisions certain streets improved by the Commonwealth under the Act of June 22, 1931, P. L. 720—see p. 728—as state highways; or because the appellant's employer secured from the Public Service Commission, prior to this proceeding, an amended certificate of public convenience, authorizing it to operate busses for the transportation of passengers for pay on a designated numbered route, which includes the street on which defendant was driving his employer's bus when arrested.

The Act of June 22, 1931, P. L. 720, supra, which provided for the taking over by the Commonwealth, *under certain terms, conditions and limitations,* of certain streets in cities—except cities of the first class— and for their improvement, etc., did not take over the city streets so designated in the act, absolutely, as state highways, in the same way that township roads designated as state highways by the Act of May 31, 1911,

P. L. 468, and its amendments were taken over by the Commonwealth. The Act of 1931 in section 4, p. 747, expressly provides, inter alia: "This act is not intended, and shall not be construed, (a) To place upon the Commonwealth any duty to regulate traffic or police the streets herein taken over by the Commonwealth, but such duty shall be and remain the obligation of the cities; ...... (f) To place upon the Department of Highways any authority to regulate traffic, parking, or the general use by the traveling public of the streets, or sections thereof, taken over by the Commonwealth for maintenance or improvement under the provisions of this act."

The Pennsylvania Greyhound Lines, Inc., appellant's employer, or one of its constituent companies, for a number of years prior to May 28, 1935, operated, under a certificate of public convenience issued by the Public Service Commission of this Commonwealth, a line or lines of busses for the transportation of passengers for pay from Philadelphia to Scranton and Wilkes-Barre, by way of Easton. The highway route designated and used was Route No. 611, and in going through the City of Easton, none of the streets named in the College Hill restricted district was used. After certain streets in that district had been adopted as limited state highways to be improved under the Act of June 22, 1931, P. L. 720, p. 728, and designated as No. 166—later included as part of Route No. 102 and improved and paved with concrete, by the joint action and at the joint expense of City and State—but before the improvement was finished and the streets were fully open for traffic, the Bus Line applied for a modification of its certificate, authorizing it to transport passengers from Philadelphia to Easton by U. S. Highway Route No. 611, and from Easton, over State Highway Route No. 102 to Stockertown and thence by designated routes, on to Wilkes-Barre and Scranton. This was granted on

May 28, 1935, conditioned, however, *"with the right to operate over such streets in the cities located along the route as may be authorized by local authorities"* and subject to the provision, "That no right, power or privilege is granted to transport local passengers on any trip or trips in either direction between the Cities of Philadelphia and Easton and intermediate points between said places; Easton and Wind Gap [beyond Stockertown on Route No. 102] and intermediate points between said places, [and between other designated places and intermediate points], the intent and purpose of this condition being to make effective the stipulation of the applicant not to transport local passengers in the territory of certificated operator furnishing transportation service over any portion of the route." The Bus Line, therefore, under its certificate, cannot lawfully transport local passengers between Easton and Stockertown over Route 102.

On December 22, 1936, following application by the Pennsylvania Greyhound Lines, Inc., the Public Service Commission granted it a certificate of public convenience to transport persons, on schedule, over the following routes:

*Route 10—Philadelphia-Scranton:* (1) Beginning at Broad Street Station of the Pennsylvania Railroad, Philadelphia, via U. S. Route 611 to Daleville, thence via Highway Route 307 to City of Scranton. (2) Beginning at the Broad Street Station of the Pennsylvania Railroad, Philadelphia, via U. S. Highway Route No. 611 to Easton, thence over State Highway Route No. 102 to Stockertown, thence ...... to Wilkes-Barre, thence ...... to Scranton. *Alternate Route.* Between Easton and Bartonsville, Monroe County, via Highway Route No. 102, Stockertown, and Highway Routes Nos. 12 and 209.

*Route 11—Philadelphia-Wilkes-Barre.* Beginning at Greyhound Bus Terminal in the City of Philadelphia,

thence over U. S. Highway Route 611 through Easton to Swiftwater, thence over Pennsylvania Highway Route 115 to Pennsylvania-Lehigh Valley Railroad in the City of Wilkes-Barre. *Alternate Route.* Between Easton and Bartonsville, Monroe County, via Highway Route 102, Stockertown and Highway Routes 12 and 209.

Each of these routes so designated by the Public Service Commission contained the limitary provision above noted, "with the right to operate over such streets in the cities located along the route as may be authorized by the local authorities"; and the right, power and privilege to transport local passengers in either direction between the Cities of Philadelphia and Easton and intermediate points, and between Easton and Wind Gap and intermediate points, was expressly withheld.

It is clear, therefore, that the Bus Line possesses no authority from the Public Service Commission authorizing it to transport passengers in local traffic between Easton and Stockertown or intermediate points on Route 102 or between Easton and intermediate points on Route 611 to Philadelphia. And it is equally clear that the Public Service Commission in designating the routes which might be used by the Bus Line in transporting through passengers did not intend to prescribe the streets to be used by the busses within city limits, but simply granted the Bus company the right to operate over such streets, in cities located along the route, as might be authorized by the local authorities, thus reserving to the local authorities of cities, through which the busses would go, the right to prescribe what streets might be so used and what might not. And this applies to Easton as well as all other cities along the route.

The Commission was not attempting to prescribe that the busses should enter upon Route 102 by way of College Avenue, Cattell Street and Knox Avenue, which

the ordinance had closed to through bus traffic, rather than by way of Bushkill Drive, which had previously been used by the Bus Line, or North Delaware Drive, which were not affected by the ordinance; and the fact that the Department of Highways, for purposes of public convenience has designated certain streets in the College Hill restricted district, as part of Route 102, did not affect the certificate of public convenience issued by the Commission. It specifically declared that the streets to be used by the Bus Line within the cities along the route were to be those authorized by the local city authorities. The designation of highway routes in the certificate of public convenience applied only to the *roads between cities,* and as there could be no legal local traffic by Greyhound busses between Easton and Stockertown, or even Wind Gap, it did not matter whether the busses entered Route 102 just at the city limits of Easton, at Knox Avenue, or further on the way to Stockertown.

The action of the Public Service Commission in thus leaving to the local city authorities full control over the streets to be used by the Bus Line in transporting through passengers within its limits was in strict accord with the decisions of the Supreme Court and this Court in *Setzer v. City of Pottsville,* 73 Pa. Superior Ct. 573; *City of Easton v. Miller,* 69 Pa. Superior Ct. 554 (affirmed 265 Pa. 25, 108 A. 262); *Boro of Swarthmore v. P. S. C.,* 80 Pa. Superior Ct. 99 (affirmed 277 Pa. 472, 121 A. 488); *Shamokin & Mt. Carmel Transit Co. v. Mt. Carmel,* 268 Pa. 276, 110 A. 927; *Valley Railways v. Harrisburg,* 280 Pa. 385, 397, 398, 124 A. 644; *Collins v. P. S. C.,* 84 Pa. Superior Ct. 58; *Jitney Bus Assn. v. Wilkes-Barre,* 256 Pa. 462, 468, 100 A. 954. The matter cannot be better or more clearly stated than it was by our late President Judge PORTER in the Setzer case (73 Pa. Superior Ct. 575-6) : "No individual or company has the right to operate, as a common car-

rier, a motor vehicle for the transportation of persons or property, without first obtaining from the Public Service Commission a certificate of public convenience, but the authority to designate the routes over which such motor vehicles shall operate is by the Act of 1915 vested in the city. The Public Service Company Law did not make the municipalities public service companies, and cities and boroughs, acting strictly as such, are unaffected by it in the exercise of their functions and powers and in the performance of their municipal duties: *City of Easton v. Miller*, 69 Pa. Superior Ct. 554; 265 Pa. 25. It cannot, therefore, be said that the city did not have power to enact a general ordinance regulating the subject-matter with which we are now dealing. The Act of 1915 conferred upon cities power to pass ordinances of a specific and defined character, to 'designate certain streets upon which such vehicles, if operated, must be operated.' When the legislative grant is of this specific character an ordinance passed pursuant thereto cannot be impeached as invalid because it would have been regarded as unreasonable if passed under the incidental power of the municipality, or under a grant of power general in its nature. 'In other words, what the legislature distinctly says may be done, cannot be set aside by the courts because they deem it to be unreasonable or against sound policy': *Ligonier Valley R. R. Co. v. Latrobe Boro.*, 216 Pa. 221."

(3) The ordinance does not impose an undue burden on interstate commerce and is not in conflict with the commerce clause of the federal constitution (Art. I, section 8, clause 3).

The Greyhound busses, operating on the route in question, carry both interstate and intrastate passengers, indiscriminately. Both kinds of passengers use the same bus. It was testified that the usual percentage of interstate passengers traveling from Philadelphia to Wilkes-Barre and Scranton is fifty per cent. On the

day appellant was arrested twenty-five per cent. of the passengers were interstate passengers.

It was testified on behalf of appellant that, by what might almost be termed a subterfuge, if not a misrepresentation, Pennsylvania Greyhound Lines, Inc. had obtained from the Interstate Commerce Commission under section 306 of the Federal Motor Carrier Act, 1935,[2] (Act of Congress of Feb. 4, 1887, c. 104, Part II, sec. 201 to 227, as added Aug. 9, 1935, c. 498, sec. 1, 49 Stat. 543) U. S. Code, Title 49, secs. 301-327, (sometimes known as the Grandfather clause)[3] a certificate of public convenience and necessity authorizing its interstate operation of busses as a common carrier by motor vehicle from Easton to Stockertown, etc., over Highway Route 102—including, perhaps, the streets in Easton designated by that route number—without any hearing before the Commission, by representing in its application that it was in bona fide operation as a

---

[2] As bearing on the alleged discrimination considered under the first heading, it is interesting to note that the Motor Carrier Act of 1935, in section 303 (b) (8) excepts from the operation of the law "The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and part of any such municipality or municipalities except where such transportation is under a common control, management or arrangement for a continuous carriage or shipment," etc., thus recognizing the reasonableness and validity of the exception objected to in the ordinance in question.

[3] "Provided, however, That, subject to section 310, if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time ...... the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission as provided in paragraph (b) of this section and within one hundred and twenty days after this section shall take effect."

common carrier by motor vehicle on June 1, 1935 over the route for which application was made, although it was admitted that it had never operated over Route 102 from Easton to Stockertown, etc., until June 1, 1935, and that the streets in Easton designated by that route number were at that time being paved with concrete and were not open for traffic until August, 1935.

The certificate of public convenience and necessity said to have been obtained from the Interstate Commerce Commission by this disingenuous—to say the least—representation, was not offered in evidence and is not printed in the record, and, therefore, we have no accurate knowledge of its contents or the authority it purports to grant the Bus Line within the limits of the City of Easton; but a careful examination of the provisions of the Federal Motor Carrier Act, 1935, discloses to us no intention on the part of Congress to interfere with the well recognized authority of cities to regulate motor vehicle traffic within their borders and designate which of their streets may or may not be used for transportation of passengers and property by motor vehicles for pay, provided such regulations and limitations do not discriminate against nor impose an undue burden on interstate commerce. As we read the Act, Congress has not seen fit to commit that duty or authority to the Interstate Commerce Commission and it remains as it was before the passage of the Act of 1935. The Act of Congress of 1935 specifically provides that "no certificate issued under this chapter shall confer any proprietary or property rights in the use of the public highways" (Part II, sec. 207, U. S. Code Title 49, sec. 307 (b)); and it also provides that "nothing in this chapter shall be construed to affect the power of taxation of the several states or to authorize a motor carrier to do an intrastate business on the highways of any State, or to interfere with the exclusive exercise by each State of the power of regulation

of intrastate commerce by motor carriers on the highways thereof." (Part II, sec. 202, U. S. Code sec. 302 (c)).

In the light of these provisions we are of opinion that the Act of Congress of 1935 does not deny to the states the power to adopt reasonable regulations limiting the use of their highways by motor carriers engaged in operating vehicles in the transportation of passengers or property for pay in both interstate and intrastate commerce, where necessary for the preservation of the highways or the safety, health and welfare of the public.

We are, therefore, required to consider and pass upon the question whether the ordinance in suit, irrespective of the Federal Motor Carrier Act of 1935, does have the effect of imposing an unreasonable burden on interstate commerce. In our opinion it does not. The provisions of the ordinance are reasonable and not unduly burdensome to interstate transportation.

By the Federal Constitution (Art. I, sec. 8, clause 3) the Congress is given power ...... to regulate commerce with foreign nations and among the several states and with the Indian Tribes.

This delegation of power to the Federal government did not take away from the states, in the absence of Congressional legislation to the contrary, the power to regulate matters of local concern, even though they also concerned interstate commerce. *Commonwealth v. One Dodge Motor Truck*, 123 Pa. Superior Ct. 311, 330-333, 187 A. 461 (1936), affirmed in 326 Pa. 120, 191 A. 590 (1937), and cases therein cited.

It has frequently been held that the regulation of highways for the safety and convenience of its citizens is a matter of local concern for the State, so far as it does not conflict with any act of Congress and so long as it does not discriminate against interstate commerce.

In *Hendrick v. Maryland*, 235 U. S. 610, 622-623, (1915), the provisions of the Motor Vehicle Law of

Maryland imposing a reasonable registration fee graduated according to the horsepower of motor vehicles alike on resident and nonresident owners of motor vehicles as a prerequisite to the use of the state highways was sustained. In disposing of the objection that the law violated the commerce clause of the United States Constitution, the court said, through Mr. Justice McReynolds (pp. 622-623):

"The movement of motor vehicles over the highways is attended by constant and serious dangers to the public, and is also abnormally destructive to the ways themselves. Their success depends on good roads the construction and maintenance of which are exceedingly expensive; and in recent years insistent demands have been made upon the States for better facilities, especially by the ever-increasing number of those who own such vehicles. As is well known, in order to meet this demand and accommodate the growing traffic the State of Maryland has built and is maintaining a system of improved roadways. Primarily for the enforcement of good order and the protection of those within its own jurisdiction the State put into effect the above-described general regulations, including requirements for registration and licenses. A further purpose was to secure some compensation for the use of facilities provided at great cost from the class for whose needs they are essential and whose operations over them are peculiarly injurious. In the absence of national legislation covering the subject a State may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles—those moving in interstate commerce as well as others ...... The reasonableness of the State's action is always subject to inquiry in so far as it affects interstate commerce, and in that regard it is likewise subordinate to the will of Congress. [Citing cases.]"

In *Interstate Busses Corporation v. Holyoke Street Railway Co.*, 273 U. S. 45 (1927), the Supreme Court of the United States upheld a Massachusetts law requiring a carrier to obtain a municipal license before operating a motor vehicle upon public streets in the municipality for the carriage of passengers for hire so as to provide a means of transportation similar to that furnished by a railway company, by indiscriminately receiving and discharging passengers along the route on which the vehicle is operated. The court held that the law did not place an undue burden on interstate commerce, since complainant had not shown that its interstate and intrastate business could not be divided among its vehicles so as to comply with the law.

In *Morris v. Duby*, 274 U. S. 135 (1927), the Supreme Court of the United States upheld an order of the Oregon Highway Commission, made pursuant to a statute of that State, reducing the maximum combined load of motor trucks from 22,000 pounds to 16,500 pounds. The highway used by complainant in interstate commerce was an interstate highway built and maintained with federal aid under Acts of Congress assented to by the Oregon legislature. Mr. Chief Justice TAFT, delivering the opinion of the court, said (pp. 143-144) :

"An examination of the acts of Congress discloses no provision, express or implied, by which there is withheld from the State its ordinary police power to conserve the highways in the interest of the public and to prescribe such reasonable regulations for their use as may be wise to prevent injury and damage to them. In the absence of national legislation especially covering the subject of interstate commerce, the State may rightly prescribe uniform regulations adapted to promote safety upon its highways and the conservation of their use, applicable alike to vehicles moving in interstate commerce and those of its own citizens. *Hendrick*

*v. Maryland,* 235 U. S. 610, 622 et seq.; *Kane v. New Jersey,* 242 U. S. 160, 167. Of course the State may not discriminate against interstate commerce. *Buck v. Kuykendall,* 267 U. S. 307. But there is no sufficient averment of such discrimination in the bill. In the Kuykendall Case this Court said (page 315):

" 'With the increase in number and size of the vehicles used upon a highway, both the danger and the wear and tear grow. To exclude unnecessary vehicles —particularly the large ones commonly used by carriers for hire—promotes both safety and economy. State regulation of that character is valid even as applied to interstate commerce, in the absence of legislation by Congress which deals specifically with the subject. *Vandalia R. R. Co. v. Public Service Commission,* 242 U. S. 255; *Missouri Pacific Ry. Co. v. Larabee Flour Mills Co.,* 211 U. S. 612. Neither the recent federal highway acts nor the earlier post road acts, Rev. Stat. § 3964; Act March 1st, 1884, c. 9, 23 Stat. 3, do that.' "

In *Clark v. Poor,* 274 U. S. 554, (1927), it was held that a state may require interstate motor carriers to obtain a certificate of public convenience and to pay an annual tax graduated according to the number and capacity of vehicles used. Mr. Justice BRANDEIS, delivering the opinion of the court, said (p. 557):

"The highways are public property. Users of them, although engaged exclusively in interstate commerce, are subject to regulation by the state to ensure safety and convenience and the conservation of the highways."

In *Continental Baking Co. v. Woodring,* 286 U. S. 352, (1932), a Kansas statute requiring private carriers of property to obtain a license, pay a tax and, file liability insurance was sustained. Exemption of the following classes of vehicles from the provisions of the statute was held not to be unlawful discrimination against interstate commerce: (1) vehicles operating

wholly within city or village limits, (2) private carriers operating within twenty-five miles of a village or city within which they have an established place of business, (3) vehicles transporting livestock and farm products to market by their owner or carrying supplies for his own use in his own vehicle, and (4) vehicles transporting children to and from school.

In *Sproles v. Binford*, 286 U. S. 374, (1932), the Motor Vehicle Act of Texas, limiting, inter alia, net loads on trucks using the highways to 7,000 pounds, was sustained. It was held not violative of the commerce clause that section 5 exempted from its provisions "implements of husbandry, including machinery used solely for the purpose of drilling water wells, and highway building and maintenance machinery temporarily propelled or moved upon the public highways."

In *Bradley v. Public Utilities Commission*, 289 U. S. 92, (1933), it was held not to be an unlawful interference with interstate commerce for the Public Utilities Commission of Ohio to deny a certificate of public convenience over a particular state highway as part of an interstate route because of congestion of that highway where the complainant did not apply for any other route or show that no other was feasible. In delivering the opinion of the court, Mr. Justice BRANDEIS said (pp. 94-97):

"First. It is contended that the order of the Commission is void because it excludes Bradley from interstate commerce. The order does not in terms exclude him from operating interstate. The denial of the certificate excludes him merely from Route 20. ...... No amendment of the application was made or new application filed. For aught that appears, some alternate or amended route was available on which there was no congestion. If no other feasible route existed and that fact was deemed relevant, the duty to prove it rested

upon the applicant. It was not incumbent upon the Commission to offer a certificate over an alternate route.

"Second. It is contended that an order denying to a common carrier by motor a certificate to engage in interstate transportation necessarily violates the Commerce Clause. The argument is that under the rule declared in *Buck v. Kuykendall,* 267 U. S. 307 and *Bush & Sons Co. v. Maloy,* 267 U. S. 317, an interstate carrier is entitled to a certificate as of right; and that hence the reason for the commission's refusal and its purpose are immaterial. In those cases, safety was doubtless promoted when the certificate was denied, because intensification of traffic was thereby prevented. See *Stephenson v. Binford,* 287 U. S. 251, 269-272. But there, promotion of safety was merely an incident of the denial. Its purpose was to prevent competition deemed undesirable. The test employed was the adequacy of existing transportation facilities; and since the transportation in question was interstate, denial of the certificate invaded the province of Congress. In the case at bar, the purpose of the denial was to promote safety; and the test employed was congestion of the highway. The effect of the denial upon interstate commerce was merely an incident.

"Protection against accidents, as against crime, presents ordinarily a local problem. Regulation to ensure safety is an exercise of the police power. It is primarily a state function, whether the *locus* be private property or the public highways. Congress has not dealt with the subject. Hence, even where the motor cars are used exclusively in interstate commerce, a State may freely exact registration of the vehicle and an operator's license, *Hendrick v. Maryland,* 235 U. S. 610, 622; *Clark v. Poor,* 274 U. S. 554, 557; *Sprout v. South Bend,* 277 U. S. 163, 169; may require the appointment of an agent upon whom process can be served in an action arising out of operation of the vehicle within the State,

*Kane v. New Jersey*, 242 U. S. 160; *Hess v. Pawloski*, 274 U. S. 352, 356; and may require carriers to file contracts providing adequate insurance for the payment of judgments recovered for certain injuries resulting from their operations. *Continental Baking Co. v. Woodring*, 286 U. S. 352, 365-366. Compare *Packard v. Banton*, 264 U. S. 140; *Sprout v. South Bend*, 277 U. S. 163, 171-172; *Hodge Co. v. Cincinnati*, 284 U. S. 335, 337. The State may exclude from the public highways vehicles engaged exclusively in interstate commerce, if of a size deemed dangerous to the public safety, *Morris v. Duby*, 274 U. S. 135, 144; *Sproles v. Binford*, 286 U. S. 374, 389-390. Safety may require that no additional vehicle be admitted to the highway. The Commerce Clause is not violated by denial of the certificate to the appellant, if upon adequate evidence denial is deemed necessary to promote the public safety. Compare *Hammond v. Schappi Bus Line*, 275 U. S. 164, 170-171."

In *Aero Mayflower Transit Co. v. Georgia Public Service Commission*, 295 U. S. 285, (1935), the Supreme Court of the United States upheld the provisions of the Georgia Motor-Carrier Act of 1931 compelling private motor carriers in the business of transporting persons or property for hire over any state highway to obtain from the Public Service Commission a certificate of public convenience and necessity; to give a bond with adequate security for protection against damage caused by negligence; to pay $35 for the certificate; and to pay annually thereafter a registration and license fee of $25 for each vehicle so operated. These provisions as applied to interstate carriers were held not to violate the commerce clause.

In *Morf v. Bingaman*, 298 U. S. 407, (1936), the Supreme Court of the United States sustained a law of New Mexico that denied to all persons the use of the highways of the state for the transportation of any

motor vehicle, on its own wheels, for the purpose of selling it or offering it for sale within or without the state, unless the vehicle is (1) licensed by the state, or is (2) owned by a licensed automobile dealer and operated under a dealer's license, or is (3) operated under a special permit issued by the State Commissioner of Revenue for its transportation.

The cases cited by the appellant involve much different facts. In *Bush & Sons Co. v. Maloy,* 267 U. S. 317, it was held unlawful for a state to refuse to grant an interstate carrier of freight a permit to use the highways of the state in exclusively interstate commerce where the carrier was willing to comply with all applicable regulations concerning the operation of motor vehicles and it was admitted by the state that the highways were not unduly congested and that complainant's operations would not impose any heavier or different burden on the state's highways than they were then bearing. The case of *Hendrick v. Maryland,* 235 U. S. 610, supports the validity of the ordinance rather than appellant's contention. In *Buck v. Kuykendall,* 267 U. S. 307, the Washington statute declared unconstitutional was declared invalid because it was primarily a prohibition of competition, interfering with interstate commerce, rather than a regulation to secure safety on the highways or to preserve them.

The assignments of error are overruled and the judgment is affirmed.