ARTHUR BLUMENTHAL, JOSEPH C. BUNTEN, BENJAMIN G. NELSON and WILLIAM E. OTTENSTEIN,

*Plaintiffs and Appellants,*

vs.

CITY OF CHEYENNE, WYOMING, a Municipal Corporation, JOHN J. McINERNEY, Mayor of the City of Cheyenne, OSCAR E. ERICKSON and ARTHUR W. TROUT, Commissioners of the City of Cheyenne and constituting the City Council of the City of Cheyenne, Wyoming,

*Defendants and Respondents.*

(No. 2368; November 18th, 1947; 186 Pac. 2d 556)

76

For the Plaintiffs and Appellants, the cause was submitted upon the brief and also oral argument of Mr. J. A. Greenwood of Cheyenne, Wyoming.

For the Defendants and Respondents, the cause was submitted upon the brief and also oral argument of Mr. John U. Loomis and Mr. Arthur Kline, both of Cheyenne, Wyoming.

80

84

## OPINION

BLUME, Justice.

This is an action brought by the plaintiffs on behalf of themselves and all others similarly situated, against the City of Cheyenne and its mayor and commissioners,

to enjoin the enforcement of Ordinance No. 750 hereafter mentioned. The trial court refused to issue an injunction, entered judgment in favor of the defendants, and from that judgment the plaintiffs herein have appealed to this court.

Without a map of the city or personal knowledge it would be difficult to understand the detailed facts herein, so we shall give but a brief outline of the evidence presented. Cheyenne, the capitol of the state, has a population of about 35,000. Central Avenue, running north and south, divides the city between east and west. It is an extension of Yellowstone Highway, which enters the city from the north. The city is about 39 blocks long, from north to south, each block being about 300 feet in length, intersected by streets running east and west, the streets being numbered from the south of the city to the north, so that 1st street is in the south portion of the city and 31st street near Pershing Boulevard in the north. The streets, eight in number, running east and west, which are north of Pershing Boulevard (which also runs easterly and westerly) are also called avenues. 16th street is an extension of Lincoln Highway, which enters the city from the east and west. When Central Avenue comes to 16th street from the north it is closed off by, and comes to a dead end at, the depot of the Colorado and Southern railroad and by its tracks, by the depot of the Greyhound bus lines and by the Union Pacific Railroad Company's depot and its tracks. These depots and tracks and the shops of the latter company occupy the space of several blocks, namely from 15th street to about 9th street. The north end of Central Avenue, however, and the south end thereof are connected by a viaduct and approaches thereto. To reach the viaduct from Central Avenue at 16th street it would be necessary to travel one block east or one block west, then turn south about one-half block to reach the approaches to the viaduct, each ap-

proach running east and west, and being about one block long. The main viaduct runs north and south and apparently connects with the south portion of Central Avenue between 9th and 10th streets. It will, accordingly, be noted that to go over the viaduct is by a round about way. For a distance of 3 block north from 16th street, Central Avenue is abutted by business blocks and two churches. The remaining abutting property is occupied mainly by residences, but passes along two schools, including Junior High School. Two more schools, including the Senior High School, are one block east of Central Avenue. Between 22nd street and 25th street are located the state capitol and the supreme court building.

The east end of Pershing Boulevard or the extension thereof is located nearly two and one-half miles east of Central Avenue, branching off at that place from the Lincoln Highway, runs westerly and runs to Snyder Avenue several blocks west of Central Avenue. The adjacent area on the north for most of the distance is sparsely occupied by residences except three blocks east of Central Avenue. From that point on west to Snyder Avenue it is occupied mainly by residences.

8th Avenue runs east and west. It is eight blocks north of Pershing Boulevard. It is the most northerly street in the city. The area north is occupied by parks, the area south is occupied by but few residences, including the residences of three of the plaintiffs. These were constructed within the last few years.

Snyder Avenue runs north and south, connecting with 8th Avenue on the north and 16th street on the south. It is six blocks west of Central Avenue. The area north from 24th street is occupied by residences, south from 24th street is occupied mainly by warehouses. Three schools are in the neighborhood of the street, one located one block west and two schools two

blocks east of the street. The area north of 24th street is zoned to a very large extent, and is restricted as to the kind of buildings to be erected thereon and the cost thereof.

The main portion of the business section of the city is located between 15th street on the south, 19th street on the north and two blocks east and a number of blocks west of Central Avenue.

On March 11, 1946, the mayor and commissioners of the City of Cheyenne adopted Ordinance No. 750, providing as to what streets commercial motor carriers passing through the city should take. In other words, the ordinance provided a through truck route. The term commercial motor carriers was defined as any truck or trailer or combination thereof, carrying or constucted to carry cargo other than personnel, and having a rated load capacity of one ton or more. It provided that the north and south bound traffic should pass along (counting from the North) 8th Avenue west of Central Avenue to Snyder Avenue, south along Snyder Avenue to 16th street, west about one block and then south on Deming Drive, which crosses the railroads by two subways, and then goes southeasterly, finally connecting with Central Avenue some blocks south of the viaduct heretofore mentioned. It further provided that the east and west traffic (counting from the East) should pass along Pershing Boulevard to Snyder Avenue, then south to 16th street, and west from that point on 16th street and the extension thereof on Lincoln Highway.

The ordinance appears to have been adopted pursuant to demand on the part of a Cheyenne newspaper, a number of truckers and others, and after a reasonably careful survey made by some of the city authorities. The greatest traffic congestion appears to have been in the business district, and particularly on 16th street

between Central Avenue and Carey Avenue, two blocks west. It was shown that the approaches to the viaduct became slippery in the winter time; that too much traffic, and in fact all truck traffic over it was dangerous, particularly on account of possible accidents thereon and the calamity which might ensue by reason of explosion of gasoline thereon, hauled in trucks, the viaduct passing above the many tracks of the Union Pacific Railroad Company. Traffic conditions on Central Avenue and 16th street were considered dangerous, particularly on account of large commercial trucks traveling thereon. The witness Moore, Lieutenant in the Police Department, testified that 1,010 motor vehicle accidents occurred in the city in 1945, 210 of these were truck accidents; there were 113 accidents on Lincoln Highway, including 16th street; on Central Avenue there were 122 accidents; on the viaduct 34 accidents. The heaviest accidents were in the down town area. The witness Sherard, an employee of the Highway Department, had a survey made during a week in May, 1946, of the number of motor vehicles passing certain points. 8161 vehicles on the average per day passed along 16th street; 7401 at a point between the viaduct and 16th street. A survey of trucks was made in April, 1946, by the chief of police of the city, presumably of the number of trucks passing along the through truck route established, but that is not altogether clear. However, the indications would seem to be that in the neighborhood of 125 trucks per day pass along 8th and Snyder Avenues. Commissioner Trout testified that the routes adopted by the ordinance for through truck traffic are the safest because of the width of the streets, the vision and traffic thereon; that traffic thereon, after the adoption of the truck traffic route, is no heavier than on most of the other streets, and he named Evans, Warren, Central, Carey, Randall Boulevard and Thomes. He

estimated that about 100 trucks would pass along Snyder Avenue per day. The witness Riley, safety engineer of highway traffic for 13 years, testified that he investigated the traffic conditions in Cheyenne at the instance of the Colorado Motor Carriers Association. He found the traffic conditions before the adoption of the ordinance to be congested and dangerous. He found the through truck routes to be the proper routes to be adopted, and recommended that these routes be accepted by the Colorado Motor Carriers Association. The testimony of the witness Grishaber, Secretary-Manager of the Wyoming Truckers Association, was similar in effect.

Plaintiffs sue herein as abutting owners of property along the routes established for commercial through trucks. They claim that the establishment of these routes along 8th Avenue, Snyder Avenue, to about 24th street, and along Pershing Boulevard is oppressive; that much of the area is residential and zoned as to the kind of buildings to be erected thereon and the cost thereof; that the establishment of these truck routes is unreasonable; that they destroy the values of their property without compensation; that they endanger the safety, life and limb of plaintiffs and their families, especially their children; that the noise, fumes, refuse, dirt and pollution will create a public and private nuisance, and a dangerous, unsanitary condition, and cause annoyance and mental anguish. Testimony tending to support these allegations was introduced, although there was little, if any, to show any injury to health. Other facts will be mentioned hereafter in connection with the discussion of the points of law raised herein. Counsel for plaintiffs has argued 16 different points. We shall not attempt to discuss these points categorically, nor shall we attempt to examine separately the numerous authorities which are cited in the briefs of counsel.

90

I.    We have no reason to doubt that the ordinance in question imposes the inconveniences and annoyances upo nthe plaintiffs, as testified by them, showing that the scientific advancements of the present age are not an unmixed blessing.  The hardest hit appear to be those who reside along 8th Avenue and Snyder Avenue north of 23rd street, and we have no doubt that if the members of this court were situated likewise, we should attempt to be relieved therefrom, if possible.  However, the regulation of municipal affairs is vested in the Legislature and in municipal officers, pursuant to a delegation of powers.  This court has not been granted any such power, nor, for that matter, would the exercise of such power by the courts be consistent with the spirit of local self-government, or with the division of governmental power into executive, legislative and judicial.  The extent of the power of the courts in connection with municipal affairs is to see that the powers existing under or granted by the Constitution and the laws are not transcended.

II.    Reasonableness of the Method Adopted.

It does not seem to be disputed that the traffic condition in Cheyenne was such that it was necessary to find some method to relieve it.  The evidence shows that the city authorities deliberated a considerable time as to the best method to do so.  They did not act arbitrarily unless it be that they chose the particular method which they did.  The means adopted by the ordinance in question has a real, substantial and logical relation to the object sought to be accomplished, and is an effectual means to alleviate or remedy at least part of the evil of congested traffic in the city.  The cases cited by counsel on this point do not sustain his contention to the contrary.  He insists that the means adopted is illegal in that the city authorities should have compelled the railroad companies to construct under-passes

or over-passes, and not to do so, but to choose the method adopted, is an unlawful discrimination against plaintiffs. A great deal of stress is laid by counsel for plaintiffs on this point. The witness Pickett suggested that a crossing over the Union Pacific Railroad Company tracks east of the city, but outside of the limits thereof, might be used more advantageously for the east and west traffic, and the suggestion appears to have considerable merit. He stated that the railroad company did not consider the use of such crossing feasible, and being outside of the limits of the city we need not consider it further. The same may be said in connection with his suggestion that Hynds Boulevard on the west of the city could be used to relieve the congestion of the north and south traffic, since that, too, or a good part thereof, seems to be outside of the limits of the city. The Mayor of the city testified that an under-pass or over-pass at a street east of Central Avenue might, or would solve the north and south traffic. We are inclined to agree with the contention of counsel for the city that such under-pass or over-pass would solve that traffic only partially. We need not discuss the details thereof. The Mayor also testified that he had not considered such under-pass or over-pass; that it would cost several million dollars, and that it would be absurd to consider such a method. The witness Trout stated that it would take five years to construct it. The plaintiffs offered no evidence as to the cost or as to the time required to construct it. Judging from the map in evidence an under-pass or an over-pass at any point within nine blocks east of Central Avenue would be of about the same length, and in the neighborhood probably of about 2000 feet. There is, of course, no doubt that an under-pass or over-pass would cost a considerable amount of money and take considerable time to construct. Counsel for the plaintiffs also contend that a railroad company may be com-

pelled to construct such a pass or passes without contribution from anyone. Counsel for the city contend that under the provisions of Sec. 64-214, Wyoming Compiled Statutes of 1945, the city might be compelled to bear a considerable portion of the expense. We need not consider that. In many, if not most instances, congested traffic may be relieved by two or more methods. There is bound to be in such a case a discrimination against some party or parties in choosing a particular method. Hence, the mere fact of discrimination cannot be held to be a criterion of illegality. If it is necessary in a case of congested traffic for the courts to carefully scrutinize as to what is the best available method to relieve it, that would be equivalent to depriving city authorities of all discretion, and would substitute the courts as administrators of municipal affairs in that respect. But that is not the law. It is not the province of the judiciary to set up its judgment against that of the city authorities as to the method or means adopted toward the accomplishment of a legitimate object unless clearly unreasonable. The method adopted need not necessarily be the best. State ex rel. vs. City of Laramie, et al., 40 Wyo. 74, 275 Pac. 106; The People vs. Thompson, 341 Ill. 166, 173 N. E. 137. The same thought is expressed in 37 Am. Jur. 804, 805, where it is stated that "A municipal ordinance is not invalid as unreasonable merely because substantially the same result might be accomplished by the enactment of a different type of ordinance." And in Sverkerson vs. Minneapolis, 204 Minn. 388, 283 N. W. 555, 120 A. L. R. 944, 949, it is said: "The mere fact that a less burdensome course might have been adopted to accomplish the end does not invalidate an ordinance. Hauge v. Chicago, 299 U. S. 387, 392, 57 S. Ct. 241, 81 L. Ed. 297." In Lewis vs. City of South Hutchinson, 162 Kan. 104, 174 Pac. 2d 51, the court said: "In the absence of statutory limitations upon the power of the

municipal authorities, courts ordinarily will not create or impose restriction and limitations which interfere with the discretion of administrative authorities unless a clear and convincing showing is made that the proposed action of the officers of the municipality constitutes an arbitrary abuse of power equivalent, in most instances, to actual fraud or bad faith." In Fritz vs. Presbrey, 44 R. I. 207, 116 Atl. 419, the court said:

"In considering the reasonableness of the ordinance in question, passed under the delegated police power of the state, the court will apply to its provisions the tests which are applicable in determining the validity and constitutionality of a statute having a like purpose. When called upon, courts will scrutinize legislation purporting to be enacted for the public welfare to see if the object sought calls for the exercise of the police power. If such object can fairly be said to be a regulation to promote the safety, health, morals, comfort or convenience of the community, then courts will not interfere with the wide scope of legislative discretion in determining the policy to be employed in its exercise, unless it appears that the discretion has been abused and the legislative action is so clearly unreasonable and arbitrary as to be oppressive."

In People's Rapid Transit Co. vs. Atlantic City, 105 N. J. L. 286, 144 Atl. 630, affirmed in 106 N. J. L. 587, 149 Atl. 893, the court stated:

"It is settled in this state that the regulation of motor vehicles on particular streets, even to their complete exclusion therefrom, when deemed necessary in the public interest, is within the police power delegated to municipalities. West v. Asbury Park, 89 N. J. Law, 402, 99 A. 190. And, while such regulation may be considered drastic in its operation, the court is not at liberty to substitute its judgment for that of the municipality as to the best methods of relieving traffic congestion in the specified area, in the interest of the welfare of the inhabitants and frequenters of the city. Such a regulation bears a direct relationship to the public safety."

Numerous other authorities state the general principle here mentioned. See 3 McQuillin Municipal Corporations, 2d Ed., Sec. 951; 37 Am. Jur. 807, et seq.; Dec. Dig., Municipal Corporations, Secs. 63 and 703; 44 C. J. 931.

The case before us presents no exception to these rules, although counsel for the plaintiffs seems to think so. We cannot be asked to hold that when a railroad company can relieve congested traffic in part or in whole, by the construction of a viaduct or subway, that then the municipalities must, as a matter of law, compel it to construct it, and that, too, without regard to the cost thereof, instead of adopting a method which might inconvenience or trouble other property owners. Counsel's theory is that the tracks of the railroad company in the case at bar are a nuisance. That is a strong statement to make in view of the history of Cheyenne. Compare that theory with the statement in 46 C. J. 719, where it is stated: "The operation of a railroad or street railroad, constructed under due authority of law, is not, as a general rule, by reason of the objectionable features necessarily incident thereto, a nuisance in the absence of any negligence or abuse in the manner of its operation, although it may be located along a public street, or pass through a populous village or city." There appears to be at least some wisdom in the testimony of the witness Trout when he stated that "the railroad was there first." It is not shown that any of the streets which come to a dead end at the railroad tracks were ever laid out across the space occupied by the railroads. The Union Pacific Railroad Company has had its tracks, or part of them, where they are now for three-fourths of a century or more. Moreover, none of the numerous authorities cited by counsel for the plaintiffs, including a long excerpt from 44 Am. Jur. 511, et seq., are to the effect that the city authorities are compelled, as a matter of law, to lay out and establish

any streets, under-passes or over-passes across such tracks, but the power, if it exists, is permissive, not compulory, and the same discretion would seem to exist in such cases as in others. In Erie Railroad Company vs. Board of Public Utility Commissioners, 254 U. S. 394, 65 L. Ed. 322, for instance, where the commission ordered the creation of proper crossings, the court said: "If it reasonably can be said that safety requires the change it is for them (the commissioners) to say whether they will insist upon it." See Parson vs. Wright, 223 N. C. 520, 27 S. E. 2d 534, 537.

Nor are we able to say that the ordinance is unreasonable because other streets were not chosen or because the traffic by trucks was not left where it was previously. The testimony, for instance, shows that the traffic on Central Avenue before the adoption of the ordinance in question was from twenty to thirty times the traffic on Snyder Avenue, and that the traffic on the former avenue was as great at the time of the trial of this case, after the trucks had been diverted, as the traffic on the latter avenue. Moreover, it seems that in connection with the foregoing matters the rights or absence of rights which plaintiffs have in the streets on which their property abuts should be considered. That matter will be discussed later in this opinion.

Counsel for plaintiffs on oral argument strenuously urged that the ordinance makes an unlawful discrimination between truckers of commercial motor vehicles, and commercial busses hauling passengers, in that the former are forbidden to cross the viaduct, while the latter may do so, even though the weight of the latter may be greater than that of the former. Disregarding the question as to whether plaintiffs are the proper parties to raise the point, we think that there is a sufficient basis for classification. The destination of pas-

sengers on busses is ordinarily the business center of the city, while that of the commercial vehicles which merely pass through the city is not. To deny the privilege of going over the viaduct to these busses would mean that they would have to pass over some of the streets, the congestion of which is sought to be relieved. Furthermore the testimony of the witness Grishaber shows that passenger busses can turn in less space than the average truck, and that is of some importance in view of the corners to be turned in connection with the viaduct. We stated in Kenosha Auto Transport Corp. vs. City of Cheyenne, 55 Wyo. 298, 312, 100 Pac. 2d 109 that "legislative classification may rest on narrow distinctions." We think that in the case at bar the distinction is substantial.

### III. Power of City to Enact the Ordinance.

A. The assertion of counsel for plaintiffs is correct that the only powers possessed by municipalities are those delegated to them. Stewart et al. vs. City of Cheyenne, 60 Wyo. 497, 154 Pac. 2d 355. The police power is no exception. It is not inherent in municipalities. It is said in 37 Am. Jur. 905: "In the absence of direct constitutional authorization, the generally accepted view is that any police power which a municipal corporation attempts to exercise must come from the source of the state police power, the state legislature." And on page 902 it is said: "The prevailing view in this country is that the police power of municipalities exists solely by virtue of legislative or constitutional grant." It has, however, been held that a power once granted as to local affairs, like that of regulating the use of the streets, should not be considered withdrawn unless the intention of the legislature to that effect is clear. City of Ashland vs. Ashland Supply Co., 225 Ky. 123, 7 S. W. 2d 830, 835. That point must be remembered as we proceed. The power to exclude

vehicles from certain streets while permitting the use thereby of other streets has been exercised so long and so frequently that the right to exercise such power on the part of a municipality is hardly any longer an open question, provided the power has been delegated and is exercised reasonably. Thus it is said in 1 Blashfield, Cyclopedia of Automobile Law, Sec. 22: "Consequently the Legislature, or the municipality under powers granted to it, may wholly exclude motor vehicles from certain roads, streets, parks, and boulevards when such exclusion is necessary in the interest of the public safety or welfare." See also 1-2 Huddy Cyc. Automobile Law, Secs. 69 and 76; 25 Am. Jur. 560. And in the annotation in 121 A. L. R. 575, it is said: "The right of a municipality, acting within its corporate powers, to exclude automobiles from particular streets and highways, where such exclusion promotes the public safety and general welfare, appears to be well settled, but the exercise of such right must not be arbitrary, or discriminate between automobiles similarly situated." And see particularly People's Rapid Transit Company vs. Atlantic City, 105 N. J. L. 286, 144 Atl. 630, affirmed in 106 N. J. L. 587, 149 Atl. 893; Garneau vs. Eggers, 113 N. J. L. 245, 174 Atl. 250; Commonwealth vs. Kennedy, 129 Pa. Super. Ct. 149, 195 Atl. 770; Chicago Park District vs. Lattipee, 364 Ill. 182, 4 N. E. 2d 86. In a number of the authorities the delegated power was sufficiently clear so as to leave only the reasonableness of the exercise of the power an open question. Counsel for the plaintiffs, on Page 2 of his brief, states that "Plaintiffs do not contend that the city officials cannot, under the exercise of police power, regulate the use of streets within the city limits, including established highways running through the City." But he contends that they cannot prohibit the use of the streets. He argues that the power to regulate does not include the power to prohibit; that commercial truck-

ers in this case are forbidden to use the streets of the city except those designated by the ordinance, and that the power to make such rule is not included in the power to regulate. It is not claimed by the city that it has been granted the power of absolute prohibition, hence the specific question that must be decided by us is as to whether or not the power exercised in the case at bar fairly comes within the power of regulation. Before proceeding to discuss that specific question it may not be amiss, notwithstanding the concession as to the power to regulate made by counsel for the plaintiffs, as above mentioned, to point out the powers granted to the City of Cheyenne and some of the rules pertaining to such powers, in as much as they may shed some light on the direct question before us.

Sec. 29-3418, Wyo. Compiled Statutes of 1945, which is part of the original charter of the City of Cheyenne gives the city the power "to regulate, prevent and punish the riding, driving or passing of horses, mules, oxen, cattle or other teams, or any vehicle drawn thereby, over, upon or across the sidewalks, or along any streets of the city." In Western Auto Transports, Inc. vs. City of Cheyenne, infra, we referred to the limited power which the city had by reason of this provision. It relates to the driving of vehicles on the streets of the city which were drawn by animals. It is somewhat strange that half a century after the advent of the automobile we should still find an unmodified statute revolving round horse-drawn, mule-drawn or oxen-drawn vehicles, which, practically speaking, no longer exist except partially as an exhibit at the "Frontier Show". But so it is. Counsel for the city contend that the provision should be construed as including motor vehicles. It would seem that this contention must be upheld under the rule of Pellish Bros. vs. Cooper, 47 Wyo. 480, 38 Pac. 2d 607. The statute apparently refers to all vehicles driven by any known power in exist-

ence when the statute was passed, and it may, there
fore, be said to refer to the whole genus of power which
propels vehicles. Counsel for the city have cited us to
the case of Taylor vs. Roberts, 84 Fla. 654, 94 So. 874,
which has specifically decided the point in question. In
that case it appears that the municipal authorities were
granted the power to pass ordinances "to license, tax,
and regulate hackney carriages, carts, omnibuses,
wagons and drays." The court said: "Automobiles at
that time were not in use, but the purpose of this pro-
vision was to vest in the city council full power to regu-
late all the then known classes of vehicles using the
streets, and the subsequent use of the streets by a new
and different kind of vehicle warrants the extension of
this power to the control of the automobile by the city
council." It must, accordingly, be held that the city
was specifically granted the power to regulate the driv-
ing of motor vehicles over, upon or along the streets of
the city. Similar language was used in a statute in-
volved in McConvill vs. The Mayor, etc. of Jersey City,
39 N. J. L. 38, where the court stated: "To regulate and
control the driving of cattle, etc., cannot mean to pre-
vent such driving altogether, but to establish rules and
*limits*, according to and within which it may be done."
(Italics supplied). In addition in the 24th Subdivision
of the Section of the statute last above mentioned, the
city was given the power "to make all such ordinances,
by-laws, rules, regulations, resolutions, not inconsist-
ent with the laws of the state, as may be expedient, in
addition to the special powers in this section granted,
maintaining the peace, good government and welfare
of the city and its trade, commerce and manufactures."
That provision is what is called the general welfare
clause. It is stated by McQuillin Municipal Corpora-
tions, Sec. 950, supra, that such a clause gives power
to municipalities to regulate the use of vehicles on the
streets. That, too, is said to be true in the case of

Brown vs. Nichols, 93 Kan. 737, 145 Pac. 561, where the court said: "Power is not expressly conferred on cities of the second class to prohibit the use of the streets for any particular kinds of travel and transportation, but under the general welfare clause it is doubtless within the power of the city to make reasonable regulations as to the use of streets, and thus provide for the safety and convenience of travel and against unnecessary injury to the streets used." In the case of State vs. The Crabtree Company, 218 Minn. 36, 15 N. W. 2d 98, the court said: "No specific legislative sanction is needed to vitalize the general welfare clause of a city charter." In the case of State vs. Morrow, 175 Minn. 386, 221 N. W. 423, it was held that the general welfare clause as found in the charter is intended to give ample power to a municipality to enable it to meet and provide for new conditions as they arise. The clause, however, has its limitations. Thus we held in Western Auto Transports, Inc. vs. City of Cheyenne, infra, that the general welfare clause did not grant the city the power of taxation, citing 2 Dillon on Municipal Corporation, 637. The case at bar does not involve the power of taxation. In the case of McKelley vs. City of Murfreesboro, 162 Tenn. 304, 36 S. W. 2d 99, the city, in order to prevent traffic congestion, passed an ordinance prohibiting filling stations to be placed in certain parts of the city. The court held that the power to pass the ordinance existed under a general welfare clause, and the court stated that it could conceive of no sound basis for the insistence that the power of regulation could be conferred only by a special provision in the law. Among other things, it was stated: "While applying strictly to all ordinances the limitation of reasonableness, the extent of the powers delegated by general provisions may be construed liberally. Specific enumeration is not essential when the intention of the legislation to confer broad powers is manifest. * * * this

charter granted by the Legislature in 1925 confers 'all powers not inconsistent with the constitution and laws of this State that are necessary for the proper administration of the affairs and for the government and control and management of said city.' It is difficult to conceive of broader language. * * * Clearly the regulation and prevention of traffic congestion, which the proof in this case tends to show would be brought about by the placing of this filling station on the lot in question, is a matter affecting the safety and welfare of the city. * * * We are unable to escape the conclusion that the power to enact an ordinance for the purposes set forth comes within the grant, either express or implied, of powers conferred by the charter of the municipality." This case then specifically holds that the power granted to the City of Cheyenne as above mentioned is broad enough to relieve traffic congestion in the city. The method used toward that end is, as we have already seen, within the discretion of the city authorities, and the foregoing case, accordingly, is, we think, direct authority, or at least nearly so, that the power exercised in the case at bar is within the delegated powers granted to the City of Cheyenne.

Counsel for the plaintiffs relies, among other cases, upon Western Auto Transports, Inc. vs. Cheyenne, 57 Wyo. 351, 118 Pac. 2d 761. That case is not, we think, in point, and is not controlling in this case in any respect. It involved the question of taxation and of prohibition of the use of *all* the streets of the city, and did not involve the question as to whether or not the city had the power to prohibit the use of vehicles on part of the streets when permission to use other streets is given. We quoted, for instance, from the case of Bogue vs. Bennett, 156 Ind. 478, 60 N. E. 143, one of the strongest cases which hold that the power to regulate does not imply the power to prohibit. That case, among other things, said: "Incorporated cities and towns in

this State have the power to regulate public travel upon the streets, * * * and may have the power to prohibit the use of certain streets for certain purposes and by certain classes of vehicles; yet it is evident that they have no authority, under their implied powers, or under the general grant of power over the streets and alleys, to prohibit traction-engines or other vehicles * * * from using *all* the streets." (Italics supplied) It is, accordingly, clearly seen what we meant by the phrase that regulation does not include the power of prohibition. There can scarcely be any question that the power to regulate necessarily implies restriction in some respects, and restriction, of course, means nothing more nor less than partial prohibition. In City of Owensboro vs. Cumberland Telephone & Telegraph Co., 230 U. S. 58, 57 L. Ed. 1389, 33 Sup. Ct. 988, the court said: "The word 'regulate' is one of broad import. If the city gives a right to the use of the streets * * * it simply regulates the use when it prescribes the terms and conditions upon which they shall be used." See Words and Phrases, Perm. Ed., page 687 under the term "regulate". In Tacoma vs. Keisel, 68 Wash. 685, 124 Pac. 137, 139, 40 L. R. A., N. S., 757, the court said: "The word 'regulate' seems to necessarily imply some degree of restraint and prohibition of acts usually done in connection with the thing to be regulated. It negatives the idea that all acts which would ordinarily be performed in connection therewith may be so performed without any restraint or prohibition whatever." In the case of Shea vs. The City of Muncie, 148 Ind. 14, 46 N. E. 138, it was held that the power to regulate the sale of intoxicating liquors implies the power to confine the sale of such liquors to certain localities. The court said among other things: "The power to regulate a business, trade, etc., authorizes the municipality to confine the exercise of such business to certain localities, to certain hours of the day, etc. 20 Am. and Eng.

Ency. of Law, 723. 'It is held that the power of regulating slaughterhouses implies power to fix their location, to direct the manner of their use, and to prohibit their continuance whenever necessary to the welfare of the community. The only thing that the power recognizes as unavoidable is their right to exist, but the corporation may say how, when, and where. Under a power to regulate certain trades or occupations their exercise may be restricted to certain places, and restrictions may be laid on the manner of conducting them'." To the same effect is Cronin vs. People of the State of New York, 82 N. Y. 318, 37 Am. Rep. 564, where the court said, among other things: "To regulate implies a power of restriction and restraint." In the case of Haggenjos vs. City of Chicago, 336 Ill. 573, 168 N. E. 661, the court said, among other things: "It is argued on behalf of the plaintiff in error that the power to regulate does not include the power to prohibit, and that, if the owner of a motor vehicle may be restricted in its use in the conduct of his business only to such use as may be made of it while in motion, then the ordinance totally denies him the use of his property. It has been said often that the power to regulate does not include the power to prohibit; and this is true in the sense that mere regulation is not the same as absolute prohibition. Regulation of business or action implies the continuance of such business or action, while prohibition implies its cessation. On the other hand, the power to regulate implies the power to prohibit, except upon the observance of authorized regulation. The ordinance does not prohibit the standing of vehicles on all streets throughout the city or at all times, but only on some streets and at some times. There can be no doubt about the power of a municipality to control travel upon its streets. Such regulations, on account of the crowded condition of the streets, are a necessity for the safety and welfare of the public as well as the con-

venience of the travelers." That the power of regulation includes the power to prescribe routes which certain vehicles must take was recognized in the case of Commonwealth vs. Stodder, 2 Cushing's (Mass.) 562, decided in 1848, or nearly a century ago. In that case the city authorities were given the power to make and "adopt such rules and orders, as to them shall appear necessary and expedient, for the due regulation in such city of omnibuses, etc. * * * whether by prescribing their routes and places of standing or in any other manner whatsoever." This clearly shows that the legislature thought that to prescribe routes was a regulation. The court held that the city had the power to prescribe certain streets as the route of travel for omnibusses and stage coaches. In the case of Smallwood vs. District of Columbia, 17 Fed. 2d 210, the commissioners of the District of Columbia were given the power to make "such other regulations with respect to the control of traffic in the District, not in conflict with any law of the United States, as are deemed advisable." Under that power it was held that authority was given to exclude commercial vehicles equipped with solid tires on certain streets. Under the same power it was held in District of Columbia vs. Wheeler, 17 Fed. 2d 953, that the director of traffic was authorized to exclude horse-drawn vehicles from arterial highways or boulevards. In the case of People's Rapid Transit Company vs. Atlantic City, supra, the court, if we read the case correctly, specifically held that the ordinance excluding vehicles from certain streets constituted a regulation and not a prohibition. The court said:

"The ordinance in question, in our judgment, has gone no further than to extend the exercise of the police power to the mere question of regulation, of licensing motorbusses, and prescribing their use over certain routes of the city, and restricting their use upon certain other streets of the city, as well as regulating their

parking and loading and unloading within the limits of the city, in the interest of the public safety.

"If a power of regulation of this character were not to be accorded to the municipality, it would be difficult to apprehend by what modus operandi intelligently exercised the public safety would be properly conserved; and, within reasonable limitations in its exercise, such a power has generally been conceded to all municipalities."

In view of the foregoing authorities we see no escape from the conclusion that the ordinance in question here was a regulation and not a prohibition, and that the City of Cheyenne had ample power to enact the ordinance, unless it be for other matters argued by counsel for the plaintiffs, which we shall now proceed to examine.

B. We are not prepared to assent to the contention of counsel for plaintiffs that a municipality can in no event legislate in regard to through truck traffic, because of the fact that such through traffic routes are matters of state wide concern. Counsel has cited us to no cases so holding. We are not at all certain that the legislature of this state would agree with counsel. The condition making a through traffic route necessary in this case is one peculiar to Cheyenne. We know of no other cities in this State situated similarly, and the legislature might take the position that such requirement is distinctly local, one that should be met by the local authorities. If it is true, as counsel assert, that through traffic truck routes usually by pass municipalities—in other words, that states usually create such routes—then, in view of the peculiar conditions existing in Cheyenne, the state should create such through traffic routes that will by-pass that city. Judging from the evidence in this case the city authorities of Cheyenne would welcome such a solution. Unfortunately, in so far as this particular matter is concerned the

reservation of Fort Francis E. Warren which borders the City of Cheyenne on the west, seems to present some obstacles to creating a through truck route on that side of the City. If the City had the power and the means and territory to create a through truck route outside of the city limits, plaintiffs would have a much better standing in a court of equity than they have in the present situation.

C. Counsel also contends that the ordinance is invalid because the city has denied the use of its streets to public carriers who have been licensed by the state. We do not think so. The power exercised is that of regulation, not of prohibition. These carriers are not faced by the onerous situation mentioned in Western Auto Transports, Inc. vs. City of Cheyenne, supra. In fact, the record shows that many of these carriers are in favor of the ordinance adopted by the city. If the licenses issued by the state had, pursuant to law, contained specified routes which the carriers were to follow, the situation would be different. See annotation 66 A. L. R. 847.

D. Counsel for plaintiffs maintains that the power claimed by the city in this case is prohibited by the provisions of Sec. 60-133, Wyoming Compiled Statutes of 1945, passed in 1921. A similar section was contained in Section 14 C. 79 Session Laws of 1917. The section is as follows:

"Except as herein otherwise provided, local authorities shall have no power to pass, enforce or maintain any ordinance, rule or regulation requiring any owner, dealer or manufacturer to whom this Act (§§ 60-101— 60-140) is applicable, to pay any fee or license for the use of the public highways, or excluding any such owner, dealer or manufacturer from the free use of such public highways, excepting such driveways, speedways or roads as have been expressly set apart by law for the exclusive use of horses and light carriages, or in any other way regulating the operation of motor

vehicles or their speed upon or use of the public highways; and no ordinance, rule or regulation inconsistent with the provisions of this act now in force, or hereafter enacted, shall have any effect. Municipal corporations or other local authorities may, within their legal corporate limits, regulate the operation of vehicles offered for hire, or forming a part of processions, assemblages, or parades on public highways or public grounds; and may close for a reasonable time a specified highway for speed contests or races, with proper safety restrictions and regulations; and may exclude motor vehicles from any cemetery or burial ground; and may exclude motor vehicles used solely for commercial purposes from any park or part of a park system; and may regulate the speed of motor vehicles, but not to a speed less than twenty (20) miles per hour, except at street or alley intersections or other places of probable congestion or danger; and may regulate the places for, and manner of parking motor vehicles."

The case of Kenosha Auto Transport Corporation vs. City of Cheyenne, 55 Wyo. 298, 100 Pac. 2d 109, is not of much help herein for the reason that the foregoing statute was neither considered nor called to our attention in that case. The statute or the title thereof do not purport to repeal any power granted to the City of Cheyenne. If it repealed those heretofore mentioned it must be held to have done so by implication, and repeals by implication are not favored, the presumption being against such repeal. 59 C. J. 905, 909. And as already stated, it has been held in City of Ashland vs. Ashland Supply Co., supra, that they should not be held to be repealed unless the intention of the legislature to that effect is clear. We cannot concur in the contention of counsel for the plaintiffs that the clause referring to the free use of the streets forbids the passage of the ordinance involved herein. An identical clause was considered in City of Bellingham vs. Cissna, 44 Wash. 397, 87 Pac. 481, where the court said: "We understand the word 'free' to be used for the purpose of prohibiting a city from collecting any additional

license or fee from owners of automobiles kept for private use or making the payment of the same a condition precedent to the use of its streets. We understand that payment of the certificate fee to the Secretary of State entitles the owner of an automobile kept for private use to the free use of all streets and highways within the state, whether within or without the corporate limits of any municipality." The use—which implies the free use—of highways for travel by persons and for transports has always been considered a common and fundamental right, but nevertheless, subject to reasonable regulation. Beck vs. Cox, 77 W. Va. 442, 87 S. E. 492; Whyte vs. City of Sacramento, 65 Calif. App. 534, 224 Pac. 1008, 1013. The authorities on that point could be multiplied. See 25 Am. Jur. 457, 458; 5 Am. Jur. 526. So that when Sec. 60-133, supra, refers to the free use of the streets, it but announces a rule long ago recognized, and must be construed with the limitation that it is subject to reasonable regulation. That the free use of the streets does not necessarily include the right to use *all* the streets by every kind of vehicle has been already abundantly shown by what we have heretofore stated; so has the fact that the ordinance in question herein is a reasonable regulation.

One provision in the foregoing statute, though perhaps obscure, which has troubled us no little, but which is argued by none of the counsel herein, at least not specifically, seems to be—eliminating all unnecessary verbiage—as follows: "Except as herein otherwise provided, local authorities shall have no power to pass, enforce or maintain any ordinance, rule or regulation * * * in any * * * way regulating the * * * use of the public highways." That provision, if accepted literally, would, of course, invalidate the ordinance in question, since the power to enact it is not provided for in our statutes so as to come within the exception clause. The statute further excepts certain streets set aside for

horse-drawn vehicles by "law". That, of course, is an anachronism, throwing more or less suspicion on the whole section. This provision, if not the whole statute, seems to be the work of a thoughtless copyist. It is hardly credible that a state law would, even if it could constitutionally, attempt to set apart certain streets in municipalities for horses and light carriages. Perhaps reference was intended to a local "law"—to a regulation. If so, and vehicles now in use were substituted in the clause for those no longer in use, in order to give any meaning to the provision, such interpretation, if permissible, would come close to permitting the regulation involved herein. Counsel for the city have called our attention to the fact that the statute, except the last two sentences, relating to speeding and parking, was copied almost verbatim from either an Iowa or a South Dakota statute. Nebraska in 1905 passed a statute which contained a part of these provisions. Christensen vs. Tate, 87 Nebr. 848, 128 N. W. 622. But these provisions seem to have disappeared from the Nebraska statutes of 1911. The Iowa statute was passed in 1911. Chapter 72, Session Laws of 1911. It was repealed in 1917. Chapter 275, Sec. 28 of the Session Laws of that year. In South Dakota the statute copying the Iowa statute verbatim was passed in 1913. See Sec. 8658, South Dakota Revised Code 1919. It was repealed by Sec. 72 Chapter 251 of the Session Laws of 1929. It is not unlikely, therefore, that our statute was copied from the statute of South Dakota. We mentioned the statute in Western Auto Transports, Inc. vs. City of Cheyenne, supra, but did not construe it. The cautious reference thereto in that case indicates that we had some doubt as to the meaning of it. The Iowa statute, which did not contain any provision as to the parking of motor vehicles, was construed in 1916 by the supreme court of that state in Pugh vs. City of Des Moines, 176 Ia. 593, 156 N. W. 892. The question

in that case was whether or not an ordinance which prohibited the parking of motor vehicles on certain streets during the day time was valid. Notwithstanding the broad language in the statute in question, specifically mentioned above, the court upheld the ordinance, holding that the power to enact the ordinance existed under the charter power of the city, which was similar to the charter power of the City of Cheyenne. The South Dakota statute was construed in 1916 by the supreme court of that state in Kelly vs. James, 37 S. Dak. 272, 157 N. W. 990. The question in that case was whether or not an ordinance was valid which provided that persons operating a vehicle should keep to the right hand side of the streets as closely as possible. The charter of the city gave it power among other things to "regulate traffic and sales upon the streets, sidewalks and public places." The court upheld the ordinance as a valid police regulation, saying in part: "We are of the opinion that the Legislature, in enacting the motor vehicle law, did not intend to deprive municipalities of the power to enact ordinances in relation to the law of the road. We are of the opinion that the clauses 'free use of such public highways' and 'regulating motor vehicles or their * * * use of the public highways' contained in Section 20, supra, were not intended to give any greater privileges to drivers of motor vehicles than were enjoyed by drivers of all vehicles."

The fact stands out prominently that the ordinances in both of the foregoing cases were clearly a regulation of the use of the highways, just as much so as the ordinance in the case at bar, yet in both of these cases the ordinances and the charter powers of the municipalities were upheld. The courts, accordingly, distinctly and unequivocally ignored, rejected and repudiated the literal meaning of the statue, as though the provision herein specifically considered were not in the

statute at all. The reason is conjectural. It may be found, perhaps, in the most significant statement of the South Dakota court, added to the foregoing quotation, as follows: "We are of the opinion that these clauses did aim to prevent municipalities from singling out motor vehicles and legislating against them in particular." In other words, the court seems to have held that the main aim or at least one of the aims of the statute, was to give motor vehicles the same rights on the streets as were given to horse-drawn vehicles. It is, of course, almost absurd that we should be called on at this late date to refer to the relation of motor vehicles to horse-drawn vehicles, but our statute in that connection is the same as that of South Dakota. We have on our books what is now an ancient relic, and our interpretation must be in the light of that relic. The South Dakota case was decided soon after the enactment of its statute in question and when horse-drawn vehicles were still in common use. Hence, that court was in a much better position to know the intent and aim and purpose of the statute than we could possibly be. Probably at least partially because of the foregoing aim, the purposes of the statute and the controlling effect thereof were held to be limited in scope, and the literal meaning of the statute was, as already stated, rejected. The foregoing cases involved regulations under the charter powers of the cities; the regulations not specifically prohibited in the foregoing statute were held not to be in conflict. Doubtless the same ruling would have been made in other similar cases. In other words, the effect of the rulings seems to be that a charter power would not be held in conflict with the statute if not specifically prohibited in the statute. Whether that is the exact theory underlying the cases, or whether it is not, the unquestioned fact remains that the charter powers were held to remain in force and effect in the specific instances involved in these cases, and there is

no reason to think that a different ruling would have been made in analogous cases, and we think that the case at bar is one of the latter. The foregoing cases were decided before our statute was copied from South Dakota. It is, accordingly, not unreasonable to hold that it was adopted with the construction put upon it by the foregoing courts, especially the South Dakota court, in accordance with the rule stated in 59 C. J. 1065 to 1069. Moreover, in 1939, the legislature gave specific authority to municipalities to establish through streets. Sec. 60-527, Wyo. Compiled Statutes of 1945. That power doubtless includes the power to establish through streets mainly for the use by commercial through trucks, since the genus necessarily includes every species. While the compulsory use thereof presents, perhaps ,another question, the establishment thereof in any event cannot be attacked as illegal. Taking into consideration all that has been said on this point, we think we are constrained to say, though not without some misgivings, that Sec. 60-133, supra, cannot be held to forbid the enactment of the ordinance in question. Other reasons are urged on that point, but this opinion is already long as it is, and we shall not refer to them.

IV.   Plaintiffs lack right to question ordinance.

If, however, we are wrong in the foregoing conclusion, still the result herein would not be different, in view of the fact that we should, we think, sustain the contention of the city that the plaintiffs are not the proper parties to attack the validity of the ordinance in question; that is to say they have no cause of action, because none of their legal rights have been invaded or abridged. Plaintiffs are not here complaining as drivers of trucks, but as owners of property abutting the truck routes established by the ordinance. Courts seem to be agreed that in order that an injunction may be

issued it must be shown that the plaintiff is injured in his personal or property rights. High on Injunctions, 4th Ed., Sec. 9; 43 C. J. S. 430, 635; McQuillin Municipal Corporations, 2d Ed., Sec. 846. It is said by McQuillin in Sec. 851 that "Injunction will not lie to enjoin the enforcement of an ordinance on the ground alone that it is void. He who seeks to restrain its enforcement must allege and prove that his interests are affected by it." In the case of Ehrlich vs. Village of Wilmette, 361 Ill. 213, 197 N. E. 567, the court said: "Injunction is a preventive remedy. The powers of courts of equity do not extend to determining what laws or ordinances are valid or invalid unless such determination is incidental to the protection of rights recognized by courts of equity alone." See also 37 Am. Jur. 799; 43 C. J. 556; City of Oklahoma City vs. Norton-Johnson Buick Motor Co., 169 Okl. 179, 36 Pac. 2d 278; Ex Parte Sterling et al., 122 Tex. 108; 53 S. W. 2d 294; Kemp Hotel Operating Co. vs. City of Wichita Falls, 141 Tex. 90, 170 S. W. 2d 217, 219. We must then inquire as to what personal or property rights of the plaintiffs are affected to warrant them in asking for an injunction herein.

Counsel for plaintiffs calls the establishment of the traffic route by the ordinance vandalism, and that it has converted a residential area into bedlam. Still if the creation of a traffic route for commercial through trucks was necessary for the public welfare—and we cannot say that it was not—then the city authorities were required to use their discretion as to whether such evils should exist along the route selected or along some other route. We hardly think that this court is authorized to say that because the area where some of the plaintiffs live is zoned should be held to be decisive herein. Much of the area along Central Avenue, too, is zoned. Moreover, the fact that the area along other streets is not zoned but is residential in character,

would not make these evils any the less obnoxious to the residents along those streets, and surely counsel for plaintiffs cannot expect a court of equity to ignore the neighbors of plaintiffs who would suffer the evils of which plaintiffs complain if the contentions herein were upheld. The fact that a residential section is zoned ought, of course, be considered in establishing a through truck route, and in most instances would doubtless have controlling effect in the exercise by a municipality of its legislative discretion. Still the establishment of such zone does not, directly at least, infringe upon or control the use of the streets therein, so it would seem that the real question herein is as to what rights or control the plaintiffs have in or over the streets along which they live, the violation of which entitles them to bring this action. The streets, as the petition shows, have been dedicated to the public. The authorities are unanimous in holding that streets are dedicated or otherwise established primarily for the public who have a common right to the use thereof, and who may make such use thereof by all the usual modes of travel thereon, including by vehicles which advancing civilization may find convenient and proper. Abutting property owners have no greater rights therein and thereto than the public generally, except only that they have the additional right of ingress and egress and of a few other analogous rights such as light and air. Chicago, Burlington & Quincy Railroad Company vs. The West Chicago Street Railroad Company, 156 Ill. 255, 40 N. E. 1008; State ex rel. vs. Cox, 336 Mo. 271, 77 S. W. 2d 116; City of Elmhurst vs. Buettgen, 394 Ill. 248, 68 N. E. 2d 278, 281; Thompson vs. Smith, 155 Va. 367, 154 S. E. 579, 71 A. L. R. 604; 25 Am. Jur. 434, 448-455, 456-459, Dillon Municipal Corporations (5th Ed.) Sec. 1248; 40 C. J. S. 244-247. "Dedication or condemnation of a street" it has been said, "contemplates the most onerous and injurious

mode of use to which it can be lawfully devoted." Foster's Inc. vs. Boise City, 63 Idaho 201, 118 Pac. 2d 721. Plaintiffs bought and improved their property with the knowledge of these facts and their erroneous belief that no change in conditions would ensue is one that has not been uncommon in growing communities, but for which there is ordinarily no remedy in the courts. See 3-4 Huddy Cyclopedia of Automobile Law, 9th Ed., Sec. 2. Plaintiffs seek, in effect, to enjoin commercial through truckers from using the streets designated by the ordinance in question, though, it is true, they attempt to do so by indirection. But these truckers travel by a mode which is usual and accepted, and they are free to use the streets above mentioned. If they can be kept off these streets, it can only be done by a regulation of the municipal authorities which represent the public. Plaintiffs claim in their petition, their argument in this court, and inferentially by their testimony, that such use by the truckers constitutes a nuisance. That contention finds no support whatever in any of the authorities. If, in the absence of the ordinance in question, truckers should voluntarily choose to use the route now designated by the ordinance, the abutting property owners would not, under the foregoing rules, have any remedy whatever. And the evidence in the case shows that many of them in fact choose to use it. If, in the absence of such ordinance, the truckers should use the route so designated pursuant to the mere advice of the city authorities the result would, we think, be the same. The mere direction of the city authorities that truckers shall use the designated streets in the ordinance cannot create a nuisance if no nuisance in fact existed without such direction. The privilege of truckers to use the routes designated by the ordinance is clearly inconsistent with the claim that the use by them of these routes constitutes a public or a private nuisance. See Elliott on Roads and Streets, 4th

Ed., Sec. 1108; 1-2 Huddy, supra, Sec. 44. If it were such nuisance, it would be equally so when traveling along Central Avenue and the Lincoln Highway, and in such case the city should prohibit the use of all of the streets by them entirely. That that cannot be done is recognized even by counsel for the plaintiffs himself. The creation of noise, dust, dirt and danger to children by such trucks cannot be denied. These evils would be equally bad on almost any of the streets. They are unfortunate concomitants of advancing civilization. Society would raise a loud cry to Heaven if any legislative body should attempt to forbid their use. In Roebling vs. Trenton Pass. Ry. Co., 58 N. J. L. 666, 674, 34 Atl. 1090, 33 L. R. A. 129, the court stated: "The owner of lands abutting upon a street holds his title subject to the inconveniences and injurious consequences, including those occasioned by noise and vibration, resulting from a user which is consistent with the legitimate and proper use to which these public thoroughfares are devoted." In Cadwell vs. Connecticut Ry. & Light Co., 84 Conn. 450, 80 Atl. 285, the court, speaking of a street railway, stated:

"It is bound to conduct its business with a reasonable regard under the circumstances for the rights of others. This does not, however, signify that every annoyance, inconvenience, or feature which might be regarded as objectionable, and to which damage might be traced, attending the construction or operation of a street railway furnishes the foundation of an action. "Certain unpleasant, inconvenient, and disturbing features, from the point of view of an adjoining owner, naturally attend public travel upon a highway, if there is any considerable amount of it. This is distinctly true of highway use by street cars, and the greater the public demand and service, the greater these features almost certainly are. Dust cannot well be kept down, and vibration and noise in some measure is inevitable. Such things as these and other annoyances and inconveniences which result from a user of a highway which is consistent with a legitimate and proper use of it as a

public thoroughfare are among the penalties which a modern and busy life imposes upon those who come closest in contact with it. A user of a highway by a street railway forms no exception. Certain objectionable results are among its natural incidents. In so far as this is the case, and the consequences complained of flow naturally and normally from the conduct of the traffic under proper authority, in a reasonable manner and with due regard for the rights of other, one who conceives that he has been injured can have no redress."

The case is cited with approval in Nuttle vs. Wichita R. & Light Co., 123 Kan. 517, 256 Pac. 128, where a number of similar or analogous cases are cited. To the same effect also see State vs. Hartford St. Ry. Co., 76 Conn. 174, 56 Atl. 506. That the principle involved in these cases and in the case at bar is the same is clear.

We should, finally, inquire whether an additional servitude has been imposed upon the streets by the ordinance in question to which the abutting property owners can object. The precise question is as to whether or not the artificial increase of travel thereon by trucks which may be caused by the ordinance, is such additional servitude. There is no direct authority on the point. This is the first case on record, so far as we know, in which abutting property owners have objected to a regulation similar to that in this case. Many analogous cases have held in the negative. It is almost universally held that the use of streets by street railways pursuant to a franchise is not an additional burden for which abutting property owners are entitled to compensation, and to which, accordingly they cannot object. Elliott, Roads and Streets, 4th Ed., Sec. 886; McQuillin, supra, Sec. 1843; see 44 C. J. 986. In Kipp vs. Davis-Daly Copper Company, 41 Mont. 509, 110 Pac. 237, the plaintiffs, abutting property owners, brought suit to enjoin the defendant from constructing a street railway along their street, pursuant to a fran-

chise. The court held that plaintiffs had no cause of action, and were not entitled to any compensation by reason of such construction. The fee of the street was vested in the city, as the fee of the streets is vested in the City of Cheyenne pursuant to Sec. 29-1209, Wyo. Compiled Statutes of 1945. The court, among other things, said:

"But it is not important to inquire where the fee is vested. The respective rights of the abutting owner and the public are dependent upon the fact of dedication. In view of these provisions as well as of the rule of law recognized everywhere, the authorities which control streets and highways may use or permit the use of them in any manner or for any purpose which is reasonably incident to the appropriation of them to public travel and to the ordinary uses of streets or highways under the different conditions which arise from time to time. White v. Blanchard Bros., 178 Mass. 363, 59 N. E. 1025. For a highway is created for the use of the public, not only in view of its necessities and requirements as they exist, but also in view of the constantly changing modes and conditions of travel and transportation, brought about by improved methods and required by the increase of population and the expansion in the volume of traffic due to the ever-increasing needs of society. Were this not so, any change in these respects would require a readjustment of rights as between the public and the abutting property owner, because the result of it would of necessity be held an imposition of a new burden upon the highway, and hence upon the property of the abutting owner."

If abutting property owners cannot object in such a case, it is difficult to see how they can object in a case such as is before us. If there is any difference, it is merely one of degree, not of kind. There is one distinction. The rights or privileges of truckers to the use of streets are greater than those of the operators of a street railway. The latter need a franchise, the former do not. The difference in effect, if any, would

be to strengthen our conclusion herein, rather than to weaken it.

The judgment of the trial court is, accordingly, *affirmed*.

RINER, C.J., and KIMBALL, J., concur.